FILED
MAY - 3 2016
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

## AFFIDAVIT IN SUPPORT OF AN APPLICATON FOR ARREST WARRANT

### INTRODUCTION

I, Edward C. Roesch, being duly sworn, depose and state as follows:

### EXPERIENCE AND TRAINING

2:16MJ215

I, Edward C. Roesch, (hereinafter "your affiant"), am a sworn law enforcement officer with the Portsmouth, Virginia Police Department and have been employed as such since September 2011. Your affiant is currently assigned as a Task Force Officer of the Drug Enforcement Administration (DEA) and has been so employed since April 2015. As a Task Force Officer of the DEA, your affiant is a sworn investigative law enforcement officer of the United States within the meaning of section 2510(7) of Title 18 U.S.C., who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. Your affiant has completed extensive training emphasizing narcotic investigations and enforcement, and has participated in numerous state and federal investigations involving the illegal manufacturing, possession, sale, distribution, and importation of various controlled substances, as well as the commission of illegal financial transactions designed to conceal drug trafficking proceeds.

The facts set forth in this affidavit are based on personal involvement and participation, as well as information derived through the review of written reports, public and law enforcement database searches, statements of co-conspirators, and discussions with other law enforcement officers and agents. Since this affidavit is being submitted for the purpose of establishing probable cause, your affiant has not included each and every fact known concerning this investigation, but only those facts necessary to establish probable cause to obtain an arrest warrant.

This affidavit will establish probable cause to believe that between July 2014 and April 2015, in the Eastern District of Virginia, DERIC JAVON TWITTY conspired to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 846 and 841 (a)(1), (b)(1)(A)(i) and 18 U.S.C. § 2.

Based on your affiant's experience, knowledge, and training, your affiant knows the following:

1. The manner in which various drugs are used and the typical distribution and trafficking methods used by drug traffickers, including the typical methods used by traffickers to clandestinely transport controlled substances through airports and by common carriers such as the U.S. Mail, small parcel carriers, and freight services. Additionally, drug traffickers will transport drugs using private and/or rented motor vehicles with hidden compartments or "traps", and use couriers to transport and secrete drugs on their person or in their vehicles.

2. Powder drugs, such as cocaine, and plant-like drugs, such as marijuana, are generally brought into the Eastern District of Virginia in bulk form so as to make the most efficient use of limited space. Powder drugs, such as cocaine, and plantlike drugs such as marijuana are not manufactured or cultivated to any significant extent within the Eastern District of Virginia. "Source countries" for the manufacture and cultivation of cocaine include Central and South America (for instance, Bolivia, Peru, Columbia, Guatemala, and Mexico, among others). "Source countries" for growing marijuana include but are not limited to Mexico. Further, the Border States (such as New Mexico, Texas, Arizona and California) along with certain islands in the Caribbean area (such as Jamaica and the Bahamas) are known cocaine and marijuana distribution points for much of the United

States, including Virginia. Consequently, traffickers in drugs must themselves travel (or pay and arrange for others to travel on their behalf or arrange for others to ship on their behalf) to or from Virginia to acquire and import drugs.

3. Individuals who deal in illegal controlled substances generate substantial amounts of currency from the sale of illegal controlled substances. These individuals desire to isolate themselves from the illegal controlled substances in such a fashion that no links can be drawn between drugs, cash, and the principals behind the drugs and cash. The principals attempt to conceal the links so that they may continue to operate and generate large profits, which are usually in the form of currency, without law enforcement authorities being alerted.

4. Individuals who deal in controlled substances violate Internal Revenue Service laws by either not filing a Federal Income Tax Return, or by not reporting the revenue generated from the illegal activity.

5. Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, and other papers relating to the manufacturing, transportation, purchasing, sale, and distribution of illegal controlled substances. These individuals commonly "front" illegal controlled substances to their clients and thus, keep some type of records concerning the quantity of drugs fronted, and the amount of monies owed. These books, records, receipts, notes, ledgers, etc. are commonly maintained where the dealer in illegal controlled substances has ready access to them, such as in his/her motor vehicle or place of residence or operation.

6. Individuals who deal in illegal controlled substances routinely secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their

residence and/or motor vehicles for ready access. Efforts to secrete these items are designed, in part, to conceal such items from law enforcement authorities.

7. Individuals who deal in illegal controlled substances profit from the sale of illegal controlled substances and attempt to legitimize these profits. To accomplish these goals, these individuals utilize false and fictitious bank records, foreign and domestic banks, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts.

8. Individuals who deal in illegal controlled substances often place assets, including real property, vehicles and accounts at financial institutions, in nominee names for the purpose of concealing and disguising the true owner of the assets. Even though these assets are in other names, the individual who deals in controlled substances will continue to use these assets and exercise dominion and control over them.

9. Individuals who deal in illegal controlled substances routinely keep on hand large amounts of currency in order to maintain and finance their ongoing drug business.

10. Individuals who deal in illegal controlled substances often launder their drug proceeds by structuring, or causing to be structured, financial transactions in an attempt to cause financial institutions and businesses to fail to file the required currency reports.

11. Individuals who deal in controlled substances frequently display the wealth generated by their illegal activities and purchase expensive vehicles and residences with the proceeds from their drug transactions.

## **PROBABLE CAUSE**

12. On April 21, 2015, Norfolk Police Officers were conducting routine interdiction at a local parcel distribution facility with the assistance of a narcotics detector canine. During this time, the narcotics detector canine alerted to a package. A search warrant was later obtained for this package and it was later found to contain approximately 600 grams of heroin. Norfolk Police Officers conducted a narcotics field test on the suspected heroin which yielded a positive result for the presence of heroin.

13. The package was addressed to a single-family residence in the City of Portsmouth, Virginia and was later delivered to that location. Shortly after the delivery, a co-conspirator, hereinafter referred to as CC-1, arrived and took custody of the package and was subsequently placed under arrest. A resident of this location, and co-conspirator, hereinafter referred to as CC-2, was also placed under arrest as he/she accepted the package upon its delivery.

14. During a post arrest interview with CC-1, CC-1 waived his/her Miranda rights. It was then discovered that CC-1 has been involved with narcotics trafficking under the direction of TWITTY. Furthermore, the arranged pickup of 600 grams of heroin by CC-1 on April 21, 2015 was under the direction of TWITTY. In addition, CC-1 stated that there was an agreement between TWITTY and him/her that upon CC-1 taking custody of, and delivering the 600 grams of heroin, TWITTY would pay CC-1 an amount of US currency as compensation.

15. During the arrest if CC-1, a cellular phone was recovered that was identified as being CC-1's property. Pursuant to a search warrant for the electronic contents on that cellular phone, a text message conversation was observed which is as follows:

*Conversation between CC-1 and (305) 399-7043*

*Taking place between 6:31AM-1:31PM on 04/21/2015     (R) received    (S) sent*

(R) "This my new number bro"

(S) "Who arevu"

(S) "Are you"

(S) "I'm out here bro"

(S) "Everything good bro"

(R) "You got it"

(S) "No. She didn't call"

(R) "Ok"

(R) "Still on truck.. Check area again"

(S) "I'm on it bro"

(R) "Its there"

(S) "Ok"

16. CC-1 went on to state that the above mentioned phone number, (305) 399-7043, was being operated by TWITTY during the time of this incident. CC-1 stated that he/she understood TWITTY was directing him/her to take custody of, and transport a package, he/she knew to contain an amount of heroin.

17. CC-2 was also interviewed post arrest and waived his/her Miranda rights. CC-2 stated he/she was previously contacted by TWITTY and asked to accept and receive a package at his/her residence on TWITTY's behalf. CC-2 stated he/she agreed to conduct this request as asked. CC-2 stated TWITTY informed him/her that the arranged package was to arrive on April 21, 2015 and furthermore, to notify him (TWITTY) when the package arrived. CC-2 stated he/she complied with these instructions, notified TWITTY after the arrival of the package and subsequently observed CC-1 take custody of the package shortly after its arrival.

18. A cellular phone was recovered which was identified as property of CC-2 and a search warrant was later obtained for the electronic contents of the device. Observed, was a text message conversation between CC-2 and a phone number CC-2 knew to be operated by TWITTY at the time. This is also the same phone number TWITTY used to contact CC-1 during this time period.

    *Conversation between CC-2 and (305) 399-7043*
    *Taking place between 8:39AM-1:18PM on 04/21/2015   (R) received (S) sent*
    (R) Be ready
    (S) I am what time i hope after 10
    (S) Im here and he here til 10
    (S) It dont really matter i can hope though
    (R) By 1030
    (S) Cool
    (S) Still waiting
    (S) What happened
    (R) Just to be safe.. Cause I don't like that delayed shit.. One they come just leave it on the pourch don't even answer door my boy get it
    (S) Ok
    (S) Its here

19. During several post arrest interviews with CC-1, CC-1 stated that he/she conducted numerous activities related to the distribution of narcotics on behalf of TWITTY beginning in June of 2014. These activities include, but aren't limited to, the delivery of kilogram quantities of heroin, the delivery of pound quantities of marijuana and the delivery of bulk amounts of US currency. CC-1 also confirmed that these activities occurred within cities along the East Coast, to include but not limited to, Philadelphia,

7

Pennsylvania, Bronx, New York, Charlotte, North Carolina and West Palm Beach, Florida.

20. CC-1 stated that during October of 2014, TWITTY directed CC-1 to meet him (TWITTY) at his residence; 801 Granby Street, Norfolk, Virginia. Once arrived, TWITTY presented CC-1 with a shopping bag which contained seven (7) to ten (10) pounds of marijuana. TWITTY directed CC-1 to deliver the marijuana to unknown co-conspirators in Philadelphia, Pennsylvania. CC-1 complied as directed by TWITTY and delivered the marijuana to those unknown co-conspirators. TWITTY therefore paid CC-1 $650 in US currency prior to his/her departure as well as another $650 upon his/her return.

21. CC-1 stated that during November of 2014, TWITTY instructed CC-1 to meet him (TWITTY) at his residence; 801 Granby Street, Norfolk, Virginia. Once arrived, TWITTY presented CC-1 with a backpack as he (TWITTY) directed CC-1 to deliver it to unknown co-conspirators in Philadelphia, Pennsylvania. CC-1 complied as directed by TWITTY and delivered the backpack to those unknown co-conspirators. TWITTY therefore paid CC-1 $650 in US currency prior to his/her departure as well as another $650 upon his/her return. CC-1 stated that a total of three (3) trips of this nature took place within November of 2014.

22. CC-1 stated that during December of 2014, TWITTY instructed CC-1 to meet him (TWITTY) at his residence; 801 Granby Street, Norfolk, Virginia. Once arrived, TWITTY presented CC-1 with a backpack as he (TWITTY) directed CC-1 to deliver it to unknown co-conspirators in Bronx, New York. CC-1 complied as directed by TWITTY and in doing so, made contact with an unknown co-conspirator near 675 Morris Avenue,

Bronx, New York. This unknown co-conspirator, then approached the vehicle CC-1 was operating and removed the backpack TWITTY had previously presented CC-1, and in doing so, placed another backpack in its place. CC-1 stated that at this point, he/she knew the backpack he/she was returning to TWITTY, in fact, contained heroin. CC-1 later returned to Virginia where he/she ultimately transferred the backpack to TWITTY. CC-1 received $1,000 in US currency from TWITTY prior to his/her departure, as well as another $1,000 upon his/her return. Furthermore, electronic analysis of a cellular phone owned and operated by CC-1 during this time frame, identified GPS data of 675 Morris Avenue in Bronx, New York during December of 2014.

23. CC-1 stated that during January of 2015, TWITTY directed CC-1 to meet him (TWITTY) at his residence; 801 Granby Street, Norfolk, Virginia. Once arrived, TWITTY presented CC-1 with a backpack as he (TWITTY) instructed CC-1 to deliver it to unknown co-conspirators located again, at 675 Morris Avenue in Bronx, New York. CC-1 complied as directed by TWITTY, and in doing so, made contact with the same unknown co-conspirator as described in paragraph 22. During this contact, the unknown co-conspirator r the backpack CC-1 was transporting and placed another backpack in its place. CC-1 stated that he/she knew the backpack he/she was delivering back to TWITTY, in fact, contained heroin. CC-1 received $1,000 in US currency from TWITTY prior to his/her departure, as well as another $1,000 upon his/her return. Furthermore, electronic analysis of a cellular phone owned and operated by CC-1 during this time frame, identified GPS data of 675 Morris Avenue, Bronx, New York during January of 2015.

24. CC-1 stated that during April of 2015, TWITTY directed CC-1 to purchase a luggage bag and bring it to 801 Granby Street, Norfolk, Virginia. Once CC-1 arrived, TWITTY briefly took custody of the bag and after filling it with what CC-1 believed was US currency, transferred it back into CC-1's custody. TWITTY then instructed CC-1 to deliver the bag to unknown co-conspirators in Charlotte, North Carolina. CC-1 complied as directed, and in doing so, made contact with an unknown co-conspirator within a motel parking lot. The unknown co-conspirator took custody the luggage bag and CC-1 then returned to Virginia. Furthermore, electronic analysis of a cellular phone owned and operated by CC-1 during this time period, identified GPS data for Charlotte, North Carolina during April of 2015.

25. CC-1 stated that during April of 2015, TWITTY instructed CC-1 to pick up a parcel that was being delivered to 808 Dorset Avenue in Portsmouth, Virginia. CC-1 later observed the package being delivered and subsequently took custody of it as he/she called TWITTY to notify him of such. TWITTY then directed CC-1 to return to his/her (CC-1) residence with the package. CC-1 stated TWITTY later arrived at his/her (CC-1) residence, took custody of the package and paid CC-1 $200 for his/her activities. CC-1 also stated that he/she knew the parcel to contain narcotics and that prior incidents of this same nature, contained narcotics as well.

26. A co-conspirator, hereinafter referred to as CC-3, has had a business relationship with TWITTY, centered around the distribution of narcotics, dating back to 2014. CC-3 stated that in the summer months of 2014, TWITTY told him/her that he (TWITTY) had made contact with a source of supply for marijuana, methamphetamine and heroin. CC-3 stated that in the coming weeks after that conversation, arrangements were made between

TWITTY and unknown co-conspirators to establish a routine delivery where TWITTY was to receive at least twenty-five (25) pounds of marijuana and at least one (1) kilogram of heroin every seven (7) to ten (10) days. CC-3 confirmed the delivery of these quantities to TWITTY from August 2014 to October 2014, which would total at least two-hundred twenty-five (225) pounds of marijuana and nine (9) kilograms of heroin.

27. Based upon the foregoing, I believe that probable cause exists to charge DERIC JAVON TWITTY with a violation of conspiracy to possess with the intent to distribute 1 kilogram or more of heroin in the Tidewater area of the Eastern District of Virginia, in violation of 21 U.S.C. §§ 846 and 841 (a)(1), (b)(1)(A)(i) and 18 U.S.C. § 2.

Edward C. Roesch, Task Force Officer
Drug Enforcement Administration

SUBSCRIBED AND SWORN TO BEFORE ME THIS 3rd DAY OF MAY, 2016.

UNITED STATES MAGISTRATE JUDGE
Norfolk, Virginia